USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/22/16

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------- X

**SUSAN B. EISNER,**

        **Plaintiff,**

        **- against -**

**THE CITY OF NEW YORK, MICHAEL A.**
**CARDOZO, G. FOSTER MILLS,**
**GEORGIA PESTANA, MURIEL GOODE-**
**TRUFANT, and LEONARD KOERNER,**

        **Defendants.**

--------------------------------------------------------- X

**OPINION AND ORDER**

**15-cv-1888 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Susan Eisner brings this action under the Americans with Disabilities Act ("ADA") and the New York City Human Rights Law ("NYCHRL") for disability discrimination and retaliation by her former employer, the City of New York ("the City"), and its employees. She alleges that as a result of her disability and the filing of earlier disability discrimination complaints she received negative employment reviews, had pay withheld, and was ultimately terminated.

Defendants now move for summary judgment on all claims. For the following reasons that motion is GRANTED.

1

## II.   BACKGROUND

From May 2000 until her termination in June 2013, Eisner was employed as an Assistant Corporation Counsel ("ACC") by the City's Law Department, which is "responsible for all of New York City's legal affairs."[1] Beginning in 2005, Eisner worked in the Appeals Division of the Law Department representing the City in appellate litigation in both state and federal court.[2]

Eisner had previously complained of disability discrimination and retaliation both internally and through the Equal Employment Opportunity Commission ("EEOC").  These claims were settled on July 20, 2012, and pursuant to that settlement the parties have stipulated that Eisner will not attempt to recover from claims arising prior to the settlement.[3]  Nonetheless, the facts giving rise to the prior complaints are necessary to understand the present action.

### A.   Settled Claims

In 2009, the quality of Eisner's work at the Appeals Division began to suffer, which she attributed to her subsequent diagnosis with "Major Depression,

---

[1]     Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Def. 56.1") ¶¶ 1-4.

[2]     *See id.* ¶¶ 3, 10.

[3]     *See* Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Def. Mem.") at 5 n.3.

Severe, Single Episode . . . induced post-partum following the birth of a child" and

"Anxiety and Obsessive-Compulsive disorders."[4]  According to Eisner, her

supervisor, Kristin Helmers,[5] remarked that she was "not high-functioning" and

that "no magic pill can fix you."[6]  Eisner's 2009 performance review, conducted by

Helmers, reflected her decreased job performance.[7]

Following receipt of the negative evaluation, Eisner filed an internal

Equal Employment Opportunity ("EEO") complaint alleging disability

discrimination and retaliation by Helmers.[8]  Defendant Muriel Goode-Trufant, the

EEO Officer for the Law Department throughout Eisner's tenure, conducted an

investigation that resulted in Helmers's reassignment to a different team and the

2009 evaluation being stricken from Eisner's personnel file.[9]

In 2010, the Law Department was forced to "eliminate three attorney

positions" due to budgetary constraints and selected Eisner and two other attorneys

---

[4]     Amended Complaint ¶ 15.

[5]     *See* Plaintiff's Local Civil Rule 56.1 Statement in Response to, and in
Contravention of, Defendants' Rule 56.1 Statement ("Pl. 56.1") ¶ 14.

[6]     Amended Complaint ¶ 19.

[7]     *See id.* ¶¶ 21-22.

[8]     *See* Pl. 56.1 ¶ 14.

[9]     *See id.* ¶ 15.

deemed to be the "lowest performers" in the division for transfer to other

divisions.[10]  Instead of accepting the transfer, Eisner opted to take a vacant part-

time attorney position in the Appeals Division at the urging of her treating

psychiatrist who recommended "that she needed the stability of staying in the

Appeals Division."[11]

As a result of being forced to accept a part-time position, on February

28, 2011, Eisner filed a complaint with the EEOC because she felt the decision to

transfer her resulted from continued disability discrimination and retaliation for her

earlier complaint against Helmers.[12]  In April 2012, Eisner was restored to full-time

status at the Appeals Division.[13]  That same month, the EEOC issued a "Dismissal

and Notice of Rights" finding that "the EEOC is unable to conclude that the

information obtained establishes violations of the statutes."[14]  Nonetheless, the

parties agreed to settle the issue by agreement on July 20, 2012, whereby Eisner

---

[10]     Def. 56.1 ¶¶ 11-14.

[11]     Amended Complaint ¶ 21.

[12]     *See id.* ¶ 22.

[13]     *See* Def. 56.1 ¶ 23.

[14]     Settlement Agreement, Ex. H to the Declaration of Eric Eichenholtz,
counsel for defendants, in Support of Defendants' Motion for Summary Judgment
("Eichenholtz Decl."), at 1.

released all claims of discrimination and retaliation arising prior to that date.[15]

## B.     Present Claims

Eisner continued to work for the Appeals Division until her termination on June 3, 2013.  Defendants offer two reasons for her termination: (1) a negative 2012 performance evaluation and her performance on the cases evaluated therein and (2) "questions about plaintiff's ability to follow supervisory direction and legitimate concerns about the honesty of plaintiff's timekeeping" following Hurricane Sandy.[16]  The decision to terminate Eisner was "made by 'consensus'" of all of the individual defendants who were executives in the Law Department with the exception of the EEO Officer, Goode-Trufant.[17]

### 1.     2012 Performance Review

On July 23, 2012, the first business day after the settlement of the 2011 charge, defendant Leonard Koerner, Chief of the Appeals Division, completed Eisner's 2012 performance review.[18]  The review was the "worst ever

---

[15]    *See* Settlement Agreement ¶ 1.

[16]    Def. Mem. at 6-12.

[17]    Def. 56.1 ¶ 136 (quoting Defendants' Cardozo Transcript ("Def. Cardozo Tr."), Ex. A to Eichenholtz Decl., at 114:22).

[18]    *See id.* ¶¶ 27-28.

given to Eisner."[19]  During the twelve month period covered by the evaluation,

Eisner's direct supervisor, Steve McGrath – the person who would normally

conduct the review – retired and was replaced by Francis Caputo.[20]  Although

Koerner was not Eisner's direct supervisor, he "took it upon [himself]" to conduct

Eisner's review.[21]  Koerner, for his part, justified singling out Eisner among all of

the people McGrath supervised because "the other people . . . were outstanding."[22]

Koerner's and Caputo's testimony about why Koerner conducted the

review conflicts.  Koerner testified that Caputo did not want to evaluate Eisner

because he was "uncomfortable" conducting the evaluation and that McGrath had

declined to do so, although Koerner concedes he never spoke to McGrath after his

retirement in January 2012.[23]  Caputo, on the other hand, testified that Koerner

"came to me and said 'I am going to do her evaluation.'"[24]

---

[19]     Pl. Mem. at 3.

[20]     *See* Def. 56.1 ¶¶ 30-31.

[21]     Plaintiff's Koerner Transcript ("Pl. Koerner Tr."), Ex. 12 to the Declaration of Edward Hernstadt, counsel for plaintiff, in Opposition to Defendants' Motion for Summary Judgment ("Hernstadt Decl."), at 141:22-23, 153:19-154:22.

[22]     *Id*. at 147:23-25.

[23]     *Id.* at 145:19-25, 152:21-25.

[24]     Plaintiff's Caputo Transcript ("Pl. Caputo Tr."), Ex. 14 to Hernstadt Decl., at 87:16-24.

The review focused on three specific instances of poor performance. *First*, the evaluation referenced her work in *Matter of Rosenblum v. New York City Conflicts of Interest Board* ("*COIB*").  In June 2010, Eisner represented the COIB at oral argument before the New York Appellate Division, First Department.[25] Koerner testified that the COIB found her argument "terrible" and asked for her to be removed from the case.[26]  This argument was reviewed by McGrath in her 2011 evaluation where he awarded her a "2" (out of 5, with 1 being the highest) for "Courtroom Skills" and remarked that he "like[d] her toughness in court."[27] Nonetheless, Koerner referenced the argument made in the prior evaluation period as the justification for giving Eisner a score of "2.5" for "Oral Communication."[28] Defendants, however, note that her work on the *Rosenblum* matter continued into the 2012 evaluation period.[29]

*Second*, the evaluation referenced her work in the joint argument to the New York Court of Appeals of *Nash v. New York City Department of*

---

[25]   *See* Def. 56.1 ¶ 38.

[26]   *Id.* ¶ 44.

[27]   2011 Evaluation, Ex. 2 to Hernstadt Decl., at 3.

[28]   2012 Evaluation, Ex. I to Eichenholtz Decl., at 3.

[29]   *See* Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment at 6.

7

*Education* and *Kahn v. Board of Education of the City School District of the City of New York*.  Eisner worked on the *Nash* case prior to it reaching the Court of Appeals while another ACC handled the *Kahn* appeal.[30]  Prior to argument, the Court of Appeals requested "coordinated presentation of arguments, avoiding undue repetition."[31]

McGrath emailed Eisner to request that she either argue the overlapping issues between *Kahn* and *Nash* – requiring her to be prepared to answer questions about the record in *Kahn* – or allow the other ACC to take the entire argument.[32]  McGrath made clear that "Either is ok with [the other ACC], and it is your call.  Which would you prefer?"[33]  Eisner chose the latter option.[34]  Koerner noted Eisner's decision to allow the other ACC to conduct the entire oral argument as his justification for her grade of "4" in the "Judgment" category on the 2012 evaluation.[35]

*Third*, Koerner criticized her work on the case of *D'Angelo v.*

---

[30]    *See* Def. 56.1 ¶ 50.

[31]    Court of Appeals Letter, Ex. K to Eichenholtz Decl.

[32]    *See* Nash/Kahn Emails, Ex. 6 to Hernstadt Decl., at SE0008159.

[33]    *Id.*

[34]    *See id.* at SE0008158.

[35]    2012 Evaluation at 2.

*Scoppetta*, an appeal from a case out of the Labor and Employment Law Division of the Law Department.  Defendant Georgia Pestana, Chief of the Labor and Employment Law Division, was so displeased with Eisner's work on the case that she "made it quite clear to [Koerner] that if leave [to appeal] was granted, [plaintiff] was to have nothing to do with the case."[36]

Eisner does not contest the fact of Pestana's complaint but instead points out that at the same time Pestana complained to Koerner, Pestana was simultaneously overseeing the Law Department's defense of Eisner's 2011 EEO complaint.[37]  Eisner also notes that after the filing of the 2011 complaint, Pestana directed that Eisner should no longer receive Labor and Employment cases – a move Eisner complained of as retaliation.[38]

Despite the poor evaluation, the defendants testified that there was no discussion about whether to terminate Eisner based on her performance at that time.[39]

---

[36]     Def. 56.1 ¶¶ 7, 72 (quoting Defendants' Koerner Transcript ("Def. Koerner Tr."), Ex. F to Eichenholtz Decl., at 49:11-15).

[37]     *See* 2011 Retaliation Allegation, Ex. 5 to Hernstadt Decl., at D001591-92.

[38]     *See id.* at D001591-92.

[39]     *See* Def. Cardozo Tr. at 86:20-87:19, 121:9-122:9; Defendants' Mills Transcript ("Def. Mills Tr."), Ex. C to Eichenholtz Decl., at 105:19-23.

### 2.    Hurricane Sandy Billing

On October 29, 2012, Hurricane Sandy struck New York City. Eisner's house took on "ten feet of salt water and sewage" and "[t]he lower level was completely destroyed."[40]  Eisner and her two children were evacuated by an army vehicle to an emergency shelter at a local high school because Eisner had broken her toes.[41]  Eisner and her family spent the next three weeks living with a friend.[42]

Eisner's emails to Caputo after the storm describe a "war zone."[43]  She did not have "Cable/Internet/phone" nor did she have "power or heat" and at one point the friends hosting her "lost power themselves."[44]  She noted that she had to deal with "[c]ontractors, electrician, plumber, and deliveries" as well as "claims adjusters for [her] car and house."[45]  On November 16, 2012, Eisner returned to work at the Law Department's office.[46]

---

[40]    Def. Eisner Tr. at 140:22-141:8.

[41]    *See id.* at 138:10-21

[42]    *See id.* at 141:13-14.

[43]    Post-Sandy Emails, Ex. M to the Eichenholtz Decl.

[44]    *Id.*

[45]    *Id.*

[46]    *See* Def. 56.1 ¶ 106.

The dispute over her work and relevant billing centers on the time she spent drafting a brief in the case of *Haas v. Department of Education* before returning to the office.  Defendants characterized the amount of time she spent working from home on the brief following Sandy to be "not only shocking but highly incredible" given the circumstances.[47]  By defendants' calculations, Eisner spent over 60 hours on the case before the storm and then billed "7 hours a day each work day" from home following Sandy.[48]  In total defendants calculate that she spent 118.5 hours on the brief.[49]  Eisner submits that she worked, on average, 6.4 hours per day after Sandy and only billed 85 hours total on brief preparation.[50] She notes that defendants' calculation for time billed pre-Sandy includes inadvertent double billing that she later attempted to correct.[51]

Caputo, finding the billing records unbelievable when viewed in light of the quality of the draft she submitted, "advised plaintiff by email that he would not approve her weekly time sheet" submitted in the wake of Sandy.[52]  At Caputo's

---

[47]    Def. Mem. at 10.

[48]    *Id.*

[49]    *See* Def. 56.1 ¶ 112.

[50]    *See* Pl. 56.1 ¶¶ 110, 112

[51]    *See id.* ¶ 98.

[52]    Def. 56.1 ¶ 115.

11

request, Koerner compared Eisner's appellate brief to that submitted to the lower court.  He concluded that "there was very little original drafting by Ms. Eisner" and "the vast majority of it . . . essentially had nothing to do with the case."[53]  The time sheets were eventually approved after Eisner voluntarily struck fifteen hours.[54]

### 3.   Related EEO Complaints

Eisner filed two internal EEO complaints based on the aforementioned incidents.  *First*, following receipt of the negative 2012 evaluation, Eisner filed an internal EEO charge with Goode-Trufant on September 10, 2012, alleging the negative review was the product of discrimination and retaliation.[55]  *Second*, on November 29, 2012, Eisner filed a similar internal complaint of discrimination and retaliation regarding the fact that "time sheets were not approved and, as a result, one paycheck was on hold."[56]

Goode-Trufant consolidated the two appeals, conducted an investigation, and issued a finding of "no probable cause."[57]  Eisner contends that

---

[53]   Def. Koerner Tr. at 280:12-17.

[54]   *See* Pl. Mem. at 20.

[55]   *See* Def. 56.1 ¶ 127.

[56]   *Id.* ¶ 128 (quoting Def. Goode-Trufant Tr., Ex. E to Eichenholtz Decl., at 258:14-259:4).

[57]   *Id.* ¶ 129.

Goode-Trufant's investigation was deficient because she "failed to interview

Eisner, Caputo, or [defendant Michael] Cardozo, [Corporation Counsel for the Law

Department]" and "did not check into any of the facts alleged by Eisner . . .

regarding *Rosenblum*, *D'Angelo* or *Nash*."[58]  In addition Eisner alleges that the

complaint should have been "sent to another agency for investigation" pursuant to

New York City EEO policy because "the head of the Law Department [Cardozo]

[was] personally involved."[59]

## III.   LEGAL STANDARD

Summary judgment is appropriate where, "viewing the record in the

light most favorable to the non-moving party . . . 'there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law.'"[60]  "In

making this determination . . . we resolve all ambiguities and draw all permissible

factual inferences in favor of the party against whom summary judgment is

sought."[61]  "A fact is material if it might affect the outcome of the suit under the

---

[58]   Pl. 56.1 ¶ 129.  Cardozo is allegedly implicated in the investigation because Eisner contends he reviewed her 2012 evaluation.  *See id.* ¶ 32.

[59]   *Id.* ¶ 127.

[60]   *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)) (quotation marks and citation omitted).

[61]   *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015) (quotation marks and citation omitted).

governing law, and an issue of fact is genuine if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."[62]

"The moving party bears the burden of showing the absence of a

genuine dispute as to any material fact."[63]  To defeat a motion for summary

judgment, the non-moving party must "'do more than simply show that there is

some metaphysical doubt as to the material facts, and may not rely on conclusory

allegations or unsubstantiated speculation.'"[64]  "If the non-moving party has the

burden of proof on a specific issue, the movant may satisfy its initial burden by

demonstrating the absence of evidence in support of an essential element of the

non-moving party's claim."[65]

"'The function of the district court in considering the motion for

summary judgment is not to resolve disputed questions of fact but only to

---

[62]    *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012), *aff'd*, 133 S.Ct. 2675 (2013) (quotation marks, citation, and alterations omitted).

[63]    *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[64]    *Robinson*, 781 F.3d at 44 (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).

[65]    *Chen v. New Trend Apparel*, 8 F. Supp. 3d 406, 430 (S.D.N.Y. 2014) (citing *Celotex v. Catrett*, 477 U.S. 317, 325 (1986) (further citations omitted)).

determine whether, as to any material issue, a genuine factual dispute exists.'"[66]

"'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"[67]

## IV.   APPLICABLE LAW

### A.   ADA Claims

Both discrimination and retaliation claims brought under the ADA are analyzed under the familiar *McDonnell Douglas* burden-shifting framework.[68] Under this framework "[a] plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext."[69]  In order to demonstrate pretext, the plaintiff must show both that the

---

[66]     *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)).

[67]     *Crawford*, 758 F.3d at 486 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

[68]     *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (ADA discrimination claims); *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (ADA retaliation claims).

[69]     *Sista*, 445 F.3d at 169 (citing *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program*, 198 F.3d 68, 72 (2d Cir. 1999)).

proffered reason is "false and that discrimination was the real reason" for the adverse action.[70]

There is an open question in the Second Circuit on which causal theory courts should apply when evaluating whether discrimination or retaliation constitutes the "real reason" for the adverse action.  Previously, in *Parker v. Columbia Pictures Industries*, the Second Circuit held that "a plaintiff need not demonstrate that disability was the sole cause of the adverse employment action.  Rather, [s]he must show only that disability played a motivating role in the decision."[71]  However, the Supreme Court's opinions in *Gross v. FBL Financial Services., Inc.* and *University of Texas Southwestern Medical Center v. Nassar*, raised the standard of proof for Age Discrimination in Employment Act ("ADEA") and Title VII discrimination claims from a motivating factor standard to a "but-for" causal standard.[72]

The Supreme Court's reasoning casts doubt on the standard applicable to the ADA.  In both cases the Court focused heavily on the statutes' use of the

---

[70]     *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

[71]     204 F.3d 326, 337 (2d Cir. 2000).

[72]     557 U.S. 167 (2009); 133 S. Ct. 2517 (2013).

causal word "because" in reaching its conclusion.[73]  Because the ADA uses this same wording, numerous circuits have concluded that the ADA likewise requires proof of but-for causation.[74]  The Second Circuit, for its part, has treated this issue as an open question without explicitly overturning *Parker*.[75]

In light of the Second Circuit's treatment of the issue as an open question, I conclude that the "but-for" standard applies to ADA claims.  The ADA, ADEA, and Title VII all "bar discrimination 'because of' an employee's age or disability, meaning that they prohibit discrimination that is a '"but-for" cause of

---

[73]      *See Gross*, 557 U.S. at 176 ("[T]he ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act. . . . It follows, then, that under [the ADEA], the plaintiff retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action."); *Nassar*, 133 S. Ct. at 2528 ("This enactment, like the statute at issue in *Gross*, makes it unlawful for an employer to take adverse employment action against an employee 'because' of certain criteria.  Given the lack of any meaningful textual difference between the text in this statute and the one in *Gross*, . . . Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action.").

[74]      *See Widomski v. State Univ. of New York (SUNY) at Orange*, 933 F. Supp. 2d 534, 546 n. 8 (S.D.N.Y. 2013) (collecting cases).

[75]      *See Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 Fed. App'x 739, 745 n.3 (2d Cir. 2014) ("This 'but-for' standard might also apply to her ADA retaliation claim.").

the employer's adverse decision.'"[76]  Finally, because the ADA contains no mixed-motive provision, there is no basis to construe the same statutory language differently.[77]

### B.    NYCHRL Claims

Discrimination and retaliation claims under the NYCHRL are analyzed "under a similar framework" whereby "the plaintiff must establish a prima facie case, and the defendant then has the opportunity to offer legitimate reasons for its actions."[78]  The burden then shifts to the plaintiff to demonstrate that these reasons are pretextual.[79]

NYCHRL claims must be analyzed "separately and independently from any federal and state law claims, construing [its] provisions 'broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably

---

[76]     *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012).

[77]     *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010) (holding that there is no "mixed-motive" provision in the ADA that would allow the court to distinguish the ADA from the ADEA).

[78]     *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 75-76 (2d Cir. 2015).

[79]     *See id.* at 76.

18

possible.'"[80]   Whether or not these claims are subject to the traditional *McDonnell*

*Douglas* pretext framework or the less demanding mixed motives theory remains

"unclear."[81]   The Second Circuit, however, has noted that "'the question [of which

standard to use] is also less important because the NYCHRL simplified the

discrimination inquiry: the plaintiff need only show that her employer treated her

less well, at least in part for a discriminatory reason.'"[82]   Therefore, "summary

judgment is appropriate if 'the record establishes as a matter of law' that

discrimination or retaliation 'play [ed] no role' in the defendant's actions."[83]

## V.   DISCUSSION

### A.   Retaliation

Eisner has successfully established a prima facie case of retaliation,

and defendants do not contest this point.   To make out a prima facie case of

retaliation under the ADA, a plaintiff must demonstrate that: "(1) [s]he engaged in

an activity protected by the ADA; (2) the employer was aware of this activity; (3)

---

[80]     *Id.* at 75 (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
715 F.3d 102, 109 (2d Cir. 2013)).

[81]     *Mihalik*, 715 F.3d at 110 n.8.

[82]     *Id*. (quoting *Williams v. New York City Hous. Auth.*, 61 A.D.3d 62, 78
n. 27 (1st Dep't 2009)) (brackets in original).

[83]     *Ya-Chen Chen*, 805 F.3d at 76 (quoting *Mihalik*, 715 F.3d at 110 n.8).

the employer took adverse employment action against [her]; and (4) a causal connection exists between the alleged adverse action and the protected activity."[84] Such a showing need only be "de minimis."[85]

Eisner undoubtedly engaged in protected activity that her employer was aware of when she filed her initial complaints of disability discrimination in 2009 and 2011.  She subsequently suffered adverse employment action in the form of the negative 2012 evaluation, the withholding of her direct deposit, and her eventual termination.[86]  Finally, the negative evaluation, which served as a justification for her eventual termination, was issued the first business day after she settled her 2011 discrimination charge which allows for a causal inference between the adverse action and the protected activity.[87]

---

[84]     *Treglia*, 313 F.3d at 719 (citing *Cifra v. General Electric Co.*, 252 F.3d 205, 216 (2d Cir. 2001)).

[85]     *Id.* (citing *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 444 (2d Cir. 1999)).

[86]     *See id.* at 720 ("Moreover, we have made clear that adverse employment actions are not limited to 'pecuniary emoluments.'  Lesser actions such as negative employment evaluation letters may also be considered adverse." (citation omitted)).

[87]     Typically, temporal proximity is sufficient to prove causation when the time the employer gains knowledge of the protected activity is followed closely by the adverse activity.  *See Nagle v. Marron*, 663 F.3d 100, 104 (2d Cir. 2011).  However, the Second Circuit has also considered the termination of a lawsuit to be a relevant point for measuring temporal proximity.  In *Espinal v. Goord*, the

Defendants offer two legitimate non-retaliatory reasons for the adverse actions:  (1) the negative 2012 evaluation and the specific cases of poor performances included therein and (2) Eisner's billing records and work following Hurricane Sandy.

Because of the legitimate non-discriminatory reasons offered by defendants, the burden shifts to Eisner to prove that the proffered reasons are pretextual.  Even drawing all inferences in Eisner's favor, she has failed to carry her burden of demonstrating that retaliation was the but-for cause of these adverse employment actions.

### 1.    2012 Performance Review

Although Eisner contests the validity of Koerner's assessment, she fails to point to sufficient evidence that would permit the trier of fact to conclude that retaliation was the but-for cause of the poor evaluation.  Indeed, to the extent that Eisner raises disputes of fact about whether the reasons put forward are false, she falls short of demonstrating, as she must, that a fact finder could conclude that

---

Second Circuit found that "the passage of only six months between the dismissal of [plaintiff's] lawsuit and an allegedly retaliatory beating by officers . . . is sufficient to support an inference of a causal connection."  *See* 558 F.3d 119, 129 (2d Cir. 2009).

these reasons are pretext for retaliation.[88]

Eisner points to the circumstances surrounding her evaluation as evidence of pretext.  Koerner authored only Eisner's evaluation despite the fact that McGrath's retirement affected many attorneys, and there is conflicting testimony about why Koerner conducted the evaluation himself instead of Eisner's then-supervisor Caputo.[89]  Yet the record makes clear that although the 2012 evaluation was her lowest ever, Eisner consistently performed worse than her colleagues on these evaluations regardless of the evaluator.[90]  And while Eisner points to the timing of the evaluation as suspicious, she does not contest the fact that evaluations are always completed in the month of July to coincide with the

---

[88]     *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("The dissent takes this to mean that if the plaintiff proves the asserted reason to be false, the plaintiff wins. But a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason.").

[89]     *See* Pl. Koerner Tr. at 147:8-23.

[90]     Eisner was already one of the lowest performing attorneys when she was selected for transfer in 2010, and McGrath subsequently gave Eisner the lowest grade of anyone in the Appeals Division in her 2011 evaluation.  *See* ACC Evaluation Scores, Ex. O to the Reply Declaration of Eric Eichenholtz in Further Support of Defendants' Motion for Summary Judgment.  While Caputo never completed an evaluation, he testified that "she [didn't have] a good grasp [of brief writing]."  *Id*. at 111:18-25.  The COIB and Pestana, as noted previously, also complained about her work.

Law Department's fiscal year.[91]

Even assuming Eisner has demonstrated that it was improper for Koerner to conduct the evaluation, she must demonstrate that the evaluation itself was flawed.  This she fails to do.  The specific factual issues that Eisner raises about the three cases that formed the basis for the evaluation – *Rosenblum*, *Nash/Kahn*, and *D'Angelo* – go to the reasonableness of the City's judgment in evaluating her performance, not the legitimacy or veracity of the reasoning. Factual disputes of this sort do not prevent summary judgment because the Court "'do[es] not sit as a super-personnel department that reexamines an entity's business decisions.'"[92]

*Rosenblum*:  Eisner disputes that the *Rosenblum* case should have been included in that evaluation period given that it was also referenced in her 2011 evaluation conducted by McGrath.  Her disagreement with *Rosenblum*'s inclusion ignores the undisputed fact that her work in that case continued into the 2012 evaluation period.  Regardless, contesting whether the case should have been

_____

[91]     *See* Def. 56.1 ¶ 26.

[92]     *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) (quoting *Scaria v. Rubin*, 117 F.3d 652, 655 (2d Cir. 1997)).  *Cf. Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105 (2d Cir. 2001) ("That is to say that '[w]hile the business judgment rule protects the sincere employer against second-guessing of the reasonableness of its judgments, it does not protect the employer against attacks on its credibility.'").

included misses the broader point about her performance, which was ultimately the factor that justified termination.  It is undisputed that the client in that case "demanded that Ms. Eisner be taken off the case" because "they found her argument in the Appeals Division to be terrible and they wanted her to have nothing to do with the case."[93]

*Nash/Kahn*:  Eisner's challenge related to the *Nash/Kahn* appeal similarly misses the mark.  Eisner does not point to any facts that draw into question Koerner's conclusion that the refusal to argue both cases reflected poor judgment.  Rather, she points solely to the fact that McGrath's emails to her about how the oral argument would be conducted were cordial.[94]  This is neither a disputed fact, nor one that would lead to an inference of pretext or retaliation.  Nothing in the tone of McGrath's emails undermines Koerner's assessment of Eisner's judgment when she declined to argue a case before the highest court in the state.

*D'Angelo*:  Eisner concedes that Pestana was displeased with her work on the *D'Angelo* case, but she challenges Pestana's motivation for complaining about it.  At the time Pestana complained about Eisner's work on *D'Angelo*, she

---

[93]     Def. Koerner Tr. at 85:17-86:5.

[94]     Pl. Mem. at 16-17.

was simultaneously supervising the attorney tasked with defending the Law Department against Eisner's EEO complaints.[95]  Once more, Eisner fails to raise a dispute of fact about the evidence in the record that goes directly to her poor performance.  She concedes that Pestana and attorneys for the New York City Fire Department, the client in this case, had to edit the brief she drafted and that she was removed from the case.[96]  Eisner contests the extent of these edits, but that does not create a genuine dispute of material fact about whether her performance on the brief was so deficient that other attorneys were required to rewrite her brief.[97]  Finally, while it is true that Pestana may have had an incentive to denigrate Eisner, this fact alone is insufficient to raise a plausible charge of retaliation given the uncontroverted evidence regarding her performance on the case.

### 2.   Hurricane Sandy Billing

---

[95]    *See* Pl. 56.1 ¶ 33.  It is worth noting that Eisner contradicts her own argument that there is a conflict of interest.  After Eisner filed her 2011 EEOC complaint, Pestana decided not to assign her additional Labor and Employment Division cases on "'Conflict' grounds."  2011 Retaliation Allegation at 2.  At the time Eisner argued this decision was retaliatory and wrote "how does the fact that an attorney in the Labor and Employment Division will defend against the Charge create a conflict?"  *Id.*  She now contends that any criticism of her work on a Labor and Employment Division case is inherently suspect because of a conflict of interest.

[96]    *See* Pl. 56.1 ¶ 73.

[97]    *See id.*

Eisner concedes the facts surrounding the conditions she lived and worked in after Hurricane Sandy.  Yet she does not provide any evidence to contest the fact that the brief she submitted contained "little original drafting" despite the number of hours she billed.[98]  The issues she attempts to raise do nothing to undermine the conclusion of her superiors that "[i]t was hard to believe she worked the hours she claimed she worked based on what she produced."[99]

Eisner's attempt to split hairs about the precise number of hours she billed does not raise an inference of retaliation when she concedes that Caputo and Koerner's conclusion that she did a "terrible job on [the brief] - is primarily a matter of opinion[] . . . Plaintiff cannot seek to refute."[100]  Nonetheless, in an attempt to contest the legitimacy of this opinion, she cites to contemporaneous emails criticizing her performance but notes they contain no "shock and horror."[101]  This argument falls short.

Nothing in the record indicates that Eisner's work product was ever praised.  In essence, Eisner's argument as to the falsity of the proffered reasons

---

[98]     Def. Koerner Tr. at 280:13.

[99]     Def. Goode-Trufant Tr. at 260:21-25.

[100]    Pl. Mem. at 19-20.

[101]    *Id.* at 20.

boils down to her claim that although her work may have been poor, it was not *that* poor.  Yet defendants themselves concede this.  They tell a story of a consistent underperformer, not the worst employee ever.  Koerner testified that "in light of *Nash* and some of the other cases . . . it was not fair to the rest of the office to keep her on the payroll" because "you don't want people doing average work when you have people coming in from other divisions that will do outstanding work."[102]  For these reasons, Goode-Trufant's investigation and ultimate conclusion of "no probable cause" are validated as well.[103]

Eisner has failed to carry her burden of demonstrating that a reasonable fact finder could conclude that retaliation was the but-for cause of the adverse employment actions.

### B.   Disability Discrimination

Eisner's disability discrimination claims must be dismissed because she fails to make out a prima facie case of discrimination.  A prima facie case of

---

[102]   Pl. Koerner Tr. at 260:10-14, 286:5-16.  *Accord id.* at 226:6-13 ("But when I put [*Rosenblum*] together with everything else, *Nash* and *D'Angelo*, it starts to become a problem.").

[103]   Def. 56.1 ¶ 129.  While Eisner disputes whether Goode-Trufant should have conducted the investigation herself, there is nothing in the record that would contradict the underlying factual basis for Goode-Trufant's conclusion.  Goode-Trufant extensively analyzed time records and remote access usage in reaching her conclusion.  *See generally* 2013 EEO Report, Ex. 3 to Hernstadt Decl.

disability discrimination under the ADA and the NYCHRL requires showing "(1) [her] employer is subject to the [statute]; (2) [s]he was disabled within the meaning of the [statute]; (3) [s]he was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) [s]he suffered adverse employment action because of [her] disability."[104]

Eisner has failed to adduce any facts that would give rise to an inference of disability discrimination.  She contends that "every single adverse action against [her] flows from her initial disclosure of her disability."[105]  Such a temporal argument is unavailing.  Her initial request for accommodation of her disability occurred in 2009, and she was restored to her full-time position in the Appeals Division in April 2012 after filing multiple EEO complaints.  The claimed adverse actions occurred over three years after the initial disclosure of her disability, during which time she never again requested accommodation or attributed poor performance to her disability.

Eisner also claims that Koerner, when conducting the 2012 evaluation, relied on "negative statements about Eisner by her former supervisor Helmers" in

---

[104]     *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013). *Accord Benimovich v. Fieldston Operating LLC*, No. 11 Civ. 780, 2013 WL 1189480, at *7 (S.D.N.Y. Mar. 22, 2013).

[105]     Plaintiff Susan Eisner's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 24.

particular comments that "Eisner cannot handle complex cases."[106]  There is no

evidence in the record to attribute this opinion to Helmers.  Koerner testified in his

deposition that "both [McGrath and Caputo] said that they would not trust her with

a complex case."[107]

   Eisner's disability discrimination claim is nothing more than an

argument that because she suffered from a disability and endured an adverse

employment action, the former must have caused the latter.  Such a tenuous

connection fails to make out even a prima facie case of discrimination under the

ADA or NYCHRL.[108]

  **C.**  **NYCHRL Retaliation Claim**

   In the absence of a viable federal claim, I decline to exercise

supplemental jurisdiction over the remaining retaliation claim under the NYCHRL.

The question of whether the NYCHRL claims survives summary judgment is a

close call and depends on the precise contours of the summary judgment standard.

---

[106]  *Id.*

[107]  Def. Koerner Tr. at 128:2-14.

[108]  *See White v. New York City Dep't of Educ.*, No. 12 Civ. 1376, 2014
WL 1273770, at *13 (S.D.N.Y. Mar. 28, 2014) ("[P]laintiff relies on conclusory
allegations that fall into the familiar and tired false syllogism: I am
African–American, something bad happened to me at work, therefore it must have
happened because I am African–American.").

Given the ambiguity surrounding the standard, New York state courts are better positioned to address the NYCHRL claims on summary judgment.[109]

## VI.  CONCLUSION

For the aforementioned reasons, defendants' motion for summary judgment is GRANTED.  The NYCHRL retaliation claim is hereby dismissed without prejudice.  The Clerk of the Court is directed to close this motion (Dkt. No. 25) and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            February 22, 2016

---

[109]      *See Spiegel v. Schulmann*, 604 F.3d 72, 83 (2d Cir. 2010) ("[The district Court] may determine that this area of law would benefit from further development in the state courts and therefore dismiss the claim without prejudice to refiling in state court.").

**-Appearances-**

**For Plaintiff:**

Edward Hernstadt, Esq.
Hernstadt Atlas, LLP
11 Broadway
Suite 615
New York, NY 10004
(212) 809-2501

**For Defendants:**

Eric J. Eichenholtz
Laura C. Rowntree
Assistant Corporation Counsel, NYC Law Department
100 Church Street
New York, NY 10007
(212) 788-0303